## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-20037-01-JAR |
| | ) | |
| LUIS SANCHEZ-CRUZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### MEMORANDUM ORDER

This matter comes before the Court on Defendant Luis Sanchez-Cruz's Motion to
Suppress Evidence (Doc. 49).  Defendant moves to suppress the heroin and methamphetamine
seized during the stop and subsequent search of the vehicle Defendant was driving on April 5,
2014.  The Government has responded (Doc. 52), and an evidentiary hearing was held on
October 7, 2014.  After reviewing the filings and the evidence adduced at the hearing, the Court
is now prepared to rule.  For the reasons explained in detail below, the Court denies Defendant's
motion.

### I.  Factual Background

On April 5, 2014, Defendant Luis Sanchez-Cruz and his passenger, Daniel Flores
("Flores"), were traveling west along Interstate 70 in a 2013 Dodge Challenger.  Kansas
Highway Patrol Trooper Christopher Nicholas, also westbound, took notice of the Challenger
when it began following an SUV at a close distance.  Trooper Nicholas trailed the Challenger in
his patrol car, observing as the Challenger changed lanes and approached a second vehicle from

1

behind.  As it did so, the Challenger passed a third vehicle upon the right and then switched lanes directly in front of that vehicle.  Trooper Nicholas activated his emergency lights, prompting a dashboard camera on his patrol car to begin recording the traffic stop.[1]  The Challenger pulled over.

Trooper Nicholas approached the Challenger's passenger window, greeted Defendant and Flores, and reported that he had stopped them for "cutting off" the third vehicle.  He explained that he would not write Defendant a ticket for the traffic violation, but asked to see Defendant's license and vehicle paperwork.  Defendant answered that his license had been suspended and that the Challenger belonged to his father, Francisco Sanchez.  As Defendant and Flores handed over their California identification cards, Trooper Nicholas noticed that both travelers' hands were shaking.  The trooper repeated his request for the vehicle registration and insurance documents and inquired about the travelers' destination.  Apparently uncertain as to the exact location, Defendant consulted his cell phone and responded that he was driving toward Interstate 435.  He showed the trooper his cell phone, his hands still shaking.  Eventually, Defendant concluded that he was driving to 94th Street.  Trooper Nicholas then asked if Defendant still lived at the address listed on his identification card.  Defendant asked which address was listed, then informed the trooper that he lived with his father, whose address appeared on the vehicle registration.  At that point, Trooper Nicholas returned to his patrol vehicle to run the licenses through dispatch.

Dispatch confirmed that Defendant's license was suspended, and a criminal history check

---

[1]The dashboard camera was programmed to record video retroactively, beginning from two minutes prior to the activation of the emergency lights.  The video thus captures the ostensible traffic violations Defendant committed as well as the traffic stop and subsequent search of the Challenger.  The Government introduced the dash-cam video at the evidentiary hearing, and the Court relies primarily on that video for the facts presented in this section.

revealed that Flores had a past drug conviction.  Trooper Nicholas wrote Defendant a ticket for

the suspended license and walked back to the Challenger.  He returned the travelers' documents,

indicating that Flores would have to drive.  Defendant then volunteered that he had received a

traffic ticket in Pratt, Kansas, about three months prior.  Trooper Nicholas explained the

procedure for paying the ticket and told Defendant and Flores that they were free to go.

Trooper Nicholas took two steps away from the Challenger and stopped.  He requested

permission to ask Defendant and Flores "a couple things real quick."  Defendant answered,

"Sure."  The trooper paused while Defendant and Flores exchanged seats so that Flores would be

in position to drive.  Before Defendant reentered the Challenger, Trooper Nicholas asked if

Defendant came to Kansas often.  Defendant responded in the negative and explained that he

was currently in the area because his girlfriend's father had suffered a stroke.  Defendant then

took his seat inside the vehicle, and Trooper Nicholas again obtained permission to ask more

questions.  After inquiring about the details of the travelers' visit to Kansas, the trooper asked

whether the pair had anything illegal with them, such as weapons or drugs.  They said they did

not.  When asked whether the trooper could "search [the] car real quick," Defendant answered,

"Yeah."

Defendant handed the key fob to Trooper Nicholas and stepped out of the Challenger,

leaving his cell phone in the car at the trooper's request.  Trooper Nicholas immediately

performed a pat-down search of Defendant's person and found two hundred dollars cash and a

pair of latex gloves in Defendant's pockets.  Trooper Nicholas asked Defendant what the gloves

were for.  Defendant answered that he had gotten the gloves from the hotel where he had been

staying.  Trooper Nicholas then invited Flores to step out of the car and, after patting Flores

down, found a pocket knife, a cell phone, and another two hundred dollars cash. The trooper placed the cell phone inside the car, explaining that he was doing so for officer safety purposes, and laid the pocket knife on top of the vehicle's closed trunk. Confident the scene was now secure, Trooper Nicholas asked the travelers to stand about fifteen feet away from the Challenger while he searched the vehicle.

The trooper started with the trunk, which contained a speaker box and some luggage, then moved to the cabin. About three minutes into the search, Trooper Jimerson arrived. Trooper Nicholas showed Trooper Jimerson some scratches he had noticed on the interior quarter trim panel on the passenger side of the vehicle. He also informed Jimerson of a traffic ticket he had found, issued to Flores on April 4, 2014. Trooper Jimerson then suggested moving the search to a vehicle inspection station about a mile away. Trooper Nicholas agreed, returned Flores' pocket knife, and ordered Defendant and Flores to accompany them to the inspection station.

At the inspection station, the troopers again patted down the travelers and asked them to stand about fifteen feet from the Challenger. The troopers then began to search the vehicle's trunk, cabin, and door panels. Trooper Nicholas testified at the hearing that the quarter panel trim on the driver side appeared to be loose and that some panels in the trunk looked like they had been removed several times. Trooper Nicholas also found a Phillips screwdriver and another tool—similar to a screwdriver but with a bent, two-pronged tip—in the driver-side seat-back pocket. About twenty-three minutes after moving to the vehicle inspection station, and about thirty minutes after beginning the search, Trooper Nicholas inserted a fiber-optic scope into a natural void in the driver-side quarter panel. The scope revealed nine vacuum-sealed

4

packages containing about thirteen pounds of methamphetamine and eight pounds of heroin.

Defendant denied knowledge of the packages.

## II.      Analysis

Defendant contends the troopers' actions violated his rights under the Fourth

Amendment.  He first challenges the initial stop of the Challenger, asserting that Trooper

Nicholas did not have a reasonable, articulable suspicion for pulling over the vehicle.  Defendant

also argues that he did not give legal consent to search, that the search exceeded the scope of any

consent given, and that the troopers did not have a reasonable suspicion of illegal activity to

justify the search.  Defendant therefore moves to suppress the heroin and methamphetamine

seized as a result of the stop and subsequent search of the Challenger.

### A.      Legitimacy of the Traffic Stop

Defendant first contends that Trooper Nicholas did not have a reasonable suspicion to

stop the vehicle.  "Whether a traffic stop is valid under the Fourth Amendment turns on whether

this particular officer had reasonable suspicion that this particular motorist violated any one of

the multitude of applicable traffic and equipment regulations of the jurisdiction."[2]  The Supreme

Court has defined "reasonable suspicion" as a "particularized and objective basis" for believing

the person being stopped is committing or did commit a violation.[3]  Reasonable suspicion

requires a lesser showing than probable cause.  Further, in making reasonable-suspicion

determinations, courts must look at the "totality of the circumstances" of each case to decide

whether the detaining officer has a "particularized and objective basis" for suspecting legal

---

[2]*United States v. Hunter*, 663 F.3d 1136, 1142 (10th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)).

[3]*United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

wrongdoing.[4]  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' "[5]

The Government maintains that Trooper Nicholas had a reasonable suspicion to stop the Challenger because he observed two traffic violations: (1) a violation of K.S.A. § 8-1523 for following another vehicle at an unsafe distance;[6] and (2) a violation of K.S.A. § 8-1516 or 8-1517 for passing another vehicle in an unsafe manner.[7]  Trooper Nicholas testified at the hearing that the Challenger first drew his attention when he noticed it following another vehicle at a close distance; the police report states the Challenger followed the vehicle within about one and one-half seconds.  The report continues that the Challenger then passed and changed lanes in front of another vehicle with a clearance of about one-half of a second.  Trooper Nicholas testified that a clearance of less than two seconds is normally considered an unsafe distance both for following and for switching lanes in front of another vehicle.  Defendant responds that, according to the dash-cam video, Trooper Nicholas was trailing the Challenger at a significant distance when he observed the supposed violations and that it therefore would have been difficult for the trooper to determine whether Defendant followed or passed another vehicle in an unsafe manner.  Defendant also points out that the driving conditions were sunny and dry.  Thus,

---

[4]*United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[5]*Id.* (quoting *Cortez*, 449 U.S. at 417–18).

[6]*See* K.S.A. § 8-1523(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.").

[7]*See* K.S.A. § 8-1516(a) ("The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance."); K.S.A. 8 -1517(b) ("The driver of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting such movement in safety.").

6

especially in light of Trooper Nicholas' position on a "task force . . . that aggressively enforce[s] traffic laws for the purpose of investigating other criminal activity," Defendant urges that the traffic stop was unjustified.

The dash-cam video corroborates Trooper Nicholas' police report and testimony. The video, of course, does not capture the scene as clearly as Trooper Nicholas observed it, as the trooper had the advantage of in-person depth perception while viewing the moving traffic. Nevertheless, the video clearly shows the Challenger following an SUV with less than two seconds' clearance,[8] then later passing and changing lanes in front of another vehicle with a clearance of less than one second.[9] The Tenth Circuit has approved the use of the "two-second rule" to support a reasonable suspicion for violations of both K.S.A. § 8-1523(a)[10] and § 8-1516(a).[11] And though Kansas courts have not addressed the clearance required to pass upon the right under § 8-1517(b), the Court believes the standard for passing upon the right "in safety" is the same as the standard for passing upon the left "at a safe distance" under § 8-1516(a).[12] Trooper Nicholas' use of the two-second rule thus supplied an objective justification for suspecting at least two traffic infractions. Whether the trooper had some other subjective motive

---

[8]Gov't Ex. 1 Clip 1, at 0:25–35.

[9]*Id.* at 1:18–32.

[10]*See United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004) ("We believe Weigel's use of a two-second rule of thumb together with his calculation of the interval three separate times provided the 'minimal level of objective justification' required for reasonable suspicion justifying a traffic stop."); *see also United States v. Hunter*, 663 F.3d 1136, 1142–43 (10th Cir. 2011) (finding that a trooper had reasonable suspicion to stop the defendant's vehicle where, under normal weather and road conditions, the trooper had used the two-second rule to determine that the defendant's car was following another vehicle at a one-second interval).

[11]*See United States v. White*, 584 F.3d 935, 946 (10th Cir. 2009) (finding that the district court did not clearly err in relying on the two-second rule to determine whether the defendant's car was safely clear of another vehicle before switching lanes).

[12]The parties agree. *See* Doc. 61 at 1; Doc. 62 at 2.

for stopping the Challenger, as Defendant suggests, is irrelevant.[13]  The Court therefore finds that Trooper Nicholas had a reasonable, articulable suspicion to pull over Defendant's vehicle for violations of K.S.A. §§ 8-1523(a) and 8-1517(b).

### B.    Consent to Search

Defendant next asserts that he did not give valid consent to authorize the troopers' search of the Challenger.  An officer's warrantless search of a vehicle is constitutionally permissible if the defendant voluntarily consents to the search.[14]  The Government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination made by evaluating the totality of the circumstances.[15]  The Tenth Circuit has developed a two-step test for determining voluntariness: "the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given, and (2) prove that this consent was given without implied or express duress or coercion."[16]  Factors courts have considered to determine whether consent is voluntarily given include the presence of language barriers;[17] the number of officers on the scene; officers' displays of force; officers' use of violence, threats, deception, or an aggressive tone; and the physical and mental capacity and experience of the defendant.[18]

Here, the totality of the circumstances indicates that Defendant voluntarily consented to

---

[13]*See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

[14]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001).

[15]*United States v. McRae*, 81 F.3d 1528, 1536–37 (10th Cir. 1996).

[16]*United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir 1996) (internal quotation marks omitted).

[17]*United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996).

[18]*United States v. Harrison*, 639 F.3d 1372, 1278 (10th Cir. 2011).

the search.  The dash-cam video shows that after Trooper Nicholas ran the licenses through

dispatch and confirmed the Challenger belonged to Francisco Sanchez,[19] the trooper returned the

travelers' documents and told them they were free to go.  When asked if the trooper could ask

more questions, Defendant's affirmative response was immediate and unequivocal.  Trooper

Nicholas then waited for the travelers to switch seats so that Flores would be in position to drive,

confirming that the travelers could drive away if they desired, before asking a second time

whether the trooper could ask more questions.  When Trooper Nicholas asked to search the

vehicle, Defendant again responded affirmatively and without hesitation.  The evidence shows

that both travelers were adults and were familiar with the procedure of a traffic stop, as each had

received a traffic ticket in the recent past.  Both travelers, moreover, communicated well in

English and had little trouble understanding or interacting with Trooper Nicholas.  The video

also shows that Trooper Nicholas employed no coercive tactics during the encounter.  He was

the only officer on the scene and was at all times pleasant and respectful.  He did not threaten or

deceive the travelers.  He never brandished his weapon or made any other show of force.  And

although the trooper leaned toward the car window during the traffic stop, he did so only to hear

the travelers above the noise of interstate traffic.  Under these circumstances, the Court

concludes that the Government has met its burden to show that the encounter between Trooper

Nicholas and the travelers was consensual and that Defendant's consent to search was freely and

voluntarily given.

### C.     Scope of Consent

---

[19]Trooper Nicholas had reason to verify Defendant's authority to drive the Challenger, as Defendant stated the Challenger did not belong to him.  Under such circumstances, a delay to verify a Defendant's authority to operate a vehicle does not make the traffic stop impermissible in scope.  *See, e.g.*, *United States v. Shareef*, 100 F.3d 1491, 1501–02 (10th Cir. 1996).

When law enforcement officers rely on consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search.[20]  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[21]

The Government states that Defendant's consent to search was unequivocal and that Defendant never limited or revoked his consent during the search.  Because Defendant thus gave a "general authorization to search," the Government argues that his failure to object during the search shows that the search was within the scope of his consent.[22]  Defendant responds that he consented, if at all, only to a "real quick" search of the vehicle and that a typical reasonable person would not view the troopers' thirty-minute search, spanning two different locations, as "real quick."

The Tenth Circuit "consistently and repeatedly ha[s] held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."[23]  That rule does not apply, however, where the initial authorization to search is limited rather than general.[24]  In *United States v. Wald*, the Tenth Circuit affirmed the district court's finding that an officer elicited a limited consent to search after requesting to take a "quick look

---

[20]*Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991).

[21]*Id.* at 251.

[22]*See United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).

[23]*Id.*

[24]*United States v. Wald*, 216 F.3d 1222, 1228 (10th Cir. 2000).

inside the vehicle."[25]  The resulting search had to be "quick" and should have been confined to the interior of the vehicle, which did not include the vehicle's trunk.[26]  Similarly, in this case, Trooper Nicholas requested to "search [Defendant's] car *real quick*."[27]  As in *Wald*, the scope of Defendant's consent was limited by the terms of Trooper Nicholas' request.  Thus, as in *Wald*, Defendant's consent can justify Trooper Nicholas' search only to the extent the search was "quick."

No bright-line rule delineates a "quick" vehicle search, and reasonable people can differ on the term's meaning in this context.  But case law provides some guidance.  In *United States v. Gregoire*,[28] the Tenth Circuit held that a forty-five minute search was permissible after the trooper assured the suspect the search would be quick.[29]  Because the trooper asked the suspect whether the vehicle contained illegal weapons or drugs, "[a] reasonable person would expect more than a cursory view of the vehicle."[30]  Some time into the search, the trooper found what appeared to be a false compartment in the vehicle and informed the suspect the search would take "a few more minutes."  The suspect did not object, and the court found that the forty-five minute search fell within the scope of the suspect's consent.[31]  More recently, the Eighth Circuit held a thirty-minute search to fall within the scope of consent where the officer asked to "look

---

[25]*Id.*

[26]*Id.*

[27]Gov't Ex. 1, Clip 2, at 2:42–45.

[28]425 F.3d 872 (10th Cir. 2005).

[29]*Id.* at 880.

[30]*Id.*

[31]*Id.*

[through the vehicle] real quick."[32]  And in *United States v. Ramstad*, Judge Saffels found a search to be within the scope of consent where the trooper, having received permission to take a "quick look around" the vehicle, searched for about twenty minutes before moving the vehicle to a second location and continuing the search.[33]

The Court finds this case similar to *Gregoire*.  As in *Gregoire*, Trooper Nicholas asked whether Defendant had illegal weapons or drugs, putting him on notice that the "quick" search would entail "more than a cursory view of the vehicle."  As in *Gregoire*, Defendant failed to object after the trooper communicated the search would continue: the trooper in *Gregoire* said the search would last "a few more minutes," while Trooper Nicholas informed Defendant the search would continue at a vehicle inspection station one mile away.  And the thirty-minute search at issue in this case was shorter than the search in *Gregoire*, which lasted forty-five minutes.  That Trooper Nicholas searched Defendant's car at two different locations, as in *Ramstad*, does not take the search outside the scope of Defendant's consent.  Moreover, courts routinely uphold as reasonable general-authorization searches lasting one hour or more;[34] compared with those searches, a reasonable person would find the thirty-minute search at issue here to be relatively brief.  Finally, the dash-cam video shows that the troopers acted with due diligence in conducting the search.  The Court thus concludes that the search fell within the scope of Defendant's consent.

---

[32]*United States v. Lopez-Mendoza*, 601 F.3d 861, 868–69 (8th Cir. 2010).

[33]120 F. Supp. 2d 973, 981–82 (D. Kan. 2000), *aff'd*, 308 F.3d 1139, 1146–47 (10th Cir. 2002).

[34]*See, e.g.*, *United States v. Carbajal-Iriarte*, 586 F.3d 795, 801–02 (10th Cir. 2009) (finding a search duration of over one hour to be reasonable); *United States v. Rosborough*, 366 F.3d 1145, 1147–48, 1150–51 (10th Cir. 2004) (finding a duration of about one hour to be reasonable); *United States v. Alcantar*, 271 F.3d 731, 737–38 (8th Cir. 2001) (finding a duration of about one hour to be reasonable).

Even if the search did exceed the scope of consent, however, the Court would still find the search permissible.  As explained in the next section, Trooper Nicholas developed a reasonable suspicion of illegal drug-related activity within three minutes of the time he began searching the Challenger.  That three-minute search clearly qualifies as "quick" under this circuit's case law.[35]  Thus, the vehicle search was justified both by Defendant's consent and by the trooper's reasonable suspicion of illegal activity.

### D.      Reasonable Suspicion of Illegal Activity

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[36]  A prolonged detention is proper, however, if (1) the initial detention has become a consensual encounter, or (2) the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring.[37]  The Court has already found that, after Defendant's initial traffic stop ended, Trooper Nicholas began searching the Challenger pursuant to Defendant's valid consent.  The Court next addresses whether Trooper Nicholas also had a reasonable suspicion of illegal activity to justify the search.

"To determine whether an officer has a reasonable suspicion to detain beyond the scope of the traffic stop, [courts] 'must look at the totality of the circumstances of each case to see

---

[35]See, e.g., United States v. Gigley, 213 F.3d 509, 513–515 (10th Cir. 2000) (holding that a six-minute search fell within the scope of a suspect's consent where the suspected consented on the condition that the search "would not take long"); see also United States v. Long Tien Dang, No. 05–40073–01–RDR, 2012 WL 1416680, at *7–8 (D. Kan. April 24, 2014) (finding that a ten-minute search was within the scope of the defendant's consent to the officer taking a "quick look in the car"); United States v. Franklin, No. 09–40042–JAR, 2009 WL 3335602, at *7–8 (D. Kan. Oct. 15, 2009) (finding that a search lasting four minutes and twenty seconds was a "quick search").

[36]United States v. Bradford, 423 F.3d 1149, 1156–57 (10th Cir. 2005).

[37]United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).

whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.' "[38]  Though the Government bears the burden of proof on the issue, reasonable suspicion is not "an onerous standard."[39]  "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."[40]  Indeed, "[a] factor may raise objectively reasonable suspicions even if it is not by itself proof of any illegal conduct and is quite consistent with innocent travel."[41]  In making the reasonable-suspicion determination, courts judge the officer's conduct "in light of common sense and ordinary human experience,"[42] according "deference to an officer's ability to distinguish between innocent and suspicious actions."[43]

The Court finds that Trooper Nicholas had a reasonable suspicion of illegal activity to justify searching the Challenger.  The trooper reported that Defendant was unusually talkative and that both travelers' hands were shaking during the encounter, indicating extreme nervousness.  While nervousness is frequently "of limited significance" in determining whether reasonable suspicion exists, a suspect's nervousness is entitled to more weight when it persists throughout the traffic stop, since the average citizen tends to "settle down" as the stop

---

[38]*United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[39]*United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010).

[40]*Davis*, 636 F.3d at 1291 (internal quotation marks omitted) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[41]*United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (internal quotation marks omitted) (citing *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002)).

[42]*United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

[43]*United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

14

continues.[44]  Here, the travelers' shaking hands exhibited an unusual level of nervousness which,

significantly, persisted throughout the stop even though Trooper Nicholas indicated at the outset

that he would issue only a warning for the traffic violations.[45]  Defendant's confusion about his

travel destination can also contribute to a reasonable suspicion of illegal conduct.[46]  Likewise,

Trooper Nicholas' knowledge of Flores' criminal history involving drugs can combine with

other facts to give rise to a reasonable suspicion of drug-related activity.[47]  Further, in Trooper

Nicholas' experience, drug traffickers often drive vehicles belonging to third parties, as

Defendant did here.[48]  In light of the additional fact that Defendant was traveling from the known

drug-source state of California,[49] the Court concludes that Trooper Nicholas had a particularized

and objective basis for searching the vehicle even before Defendant consented to the search.

After obtaining consent, Trooper Nicholas quickly developed further cause to search.  He

immediately performed a pat-down search and discovered latex gloves in Defendant's pockets.

---

[44]*See United States v. Williams*, 271 F.3d 1262, 1268–69 (10th Cir. 2001).

[45]*See United States v. Soto*, 988 F.2d 1548, 1550, 1556 (10th Cir. 1993) (finding a reasonable suspicion where the defendant's hands were visibly shaking even after being told he would receive only a warning for speeding).

[46]*See id.* at 1554–55 (finding a reasonable suspicion based in part on the fact that the Defendant was unable to provide a general address for his destination).

[47]*See United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009) ("[I]n conjunction with other factors, criminal history *contributes powerfully to the reasonable suspicious calculus*.") (emphasis in original) (quoting *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005)).

[48]*See United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (finding a reasonable suspicion partly because the suspect was driving a rental vehicle, which the officer knew to be "often used by narcotics traffickers").

[49]*See Illinois v. Gates*, 462 U.S. 213, 243 (1983) (finding probable cause for issuing a warrant based in part on the fact that "Florida is well-known as a source of narcotics and other illegal drugs"); *United States v. Reed*, 195 F. App'x 815, 816 (10th Cir. 2006) (identifying California as "a known drug source state"); *cf. United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998) ("[T]he mere fact that one hails from a state known for drug trafficking is not *sufficient* to support reasonable suspicion.") (emphasis added).

The trooper reasonably found it implausible that Defendant had gotten the gloves from a hotel. Moreover, in the trooper's experience, drug traffickers often use latex gloves while packaging drugs to avoid leaving fingerprints.  Defendant's gloves thus enhanced the trooper's suspicion that the Challenger might contain drugs.  Then, within three minutes of beginning to search the vehicle, Trooper Nicholas noticed scratch marks on the passenger-side interior quarter panel. The trooper knew from experience that quarter panels sometimes contain voids where drugs can be hidden.  Because the Challenger was only one year old, Trooper Nicholas suspected the scratch marks resulted not from normal wear and tear, but from the removing and replacing of the panels.  The trooper was reasonable, under the circumstances, to suspect that the panels had been removed in order to conceal narcotics.

Defendant isolates each fact relied upon by Trooper Nicholas and asserts that each "must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous."[50]  The Court disagrees.  While each fact at issue here may be capable of innocent explanation, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[51]  The individual facts relied upon, moreover, are not "incorrigibly free of associations with criminal activity."[52]  The travelers' excessive and continued nervousness, Defendant's confusion about his travel destination, Flores' prior drug conviction, the use of a third party's vehicle, the travelers' affiliation with a known drug-source

---

[50]*See United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996), overruled on other grounds by *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001).

[51]*United States v. Arvizu*, 534 U.S. 266, 277 (2002).

[52]*Cf. United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005) (finding it wholly unsuspicious for a suitcase to be locked during travel).

state, Defendant's possession of latex gloves without a credible explanation, and the scratches on the 2013 Challenger's interior quarter panels, taken together, support a reasonable suspicion of drug-related criminal activity.

Defendant also suggests that Trooper Nicholas' suspicions had been alleviated by the time the trooper discovered the drugs.  In the minutes leading up to the discovery, however, the trooper's suspicions were only confirmed.  At the vehicle inspection station, Trooper Nicholas noticed that the interior quarter panels did not fit as they should.  He also found a screw driver and another tool that appeared uniquely capable of prying the panels loose.  In light of his previous suspicion that Defendant was transporting drugs, the trooper was reasonable to continue searching until he had examined all the compartments where drugs might be hidden.[53]  The Court concludes that the search was reasonable.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant Luis Sanchez-Cruz's Motion to Suppress Evidence (Doc. 49) is **denied.**

**IT IS SO ORDERED.**

Dated: November 5, 2014

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[53]*See United States v. Ramstad*, 308 F.3d 1139, 1146–47 (10th Cir. 2002).

17